IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOC., INC., et al.,<br><br>    Plaintiffs,<br><br><br><br>vs.<br><br><br>C.R. ENGLAND, INC.,<br><br>    Defendant. | FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br><br><br><br><br>Case No. 2:02-CV-950 TS |

This matter came before the Court for bench trial on October 16-25, 2006. David A. Cohen, Brent O. Hatch, Randall Herrick-Stare, and Paul D. Cullen, Sr. appeared as counsel for class-action Plaintiffs. James S. Jardine and Elaina M. Maragakis appeared as counsel for Defendant. The Court, having observed and considered the witnesses' testimony, evidence presented at trial, and the parties' arguments, makes the following findings of fact and conclusions of law.

## I.  BACKGROUND

Plaintiffs originally sought declaratory, injunctive, and monetary relief for alleged violations by Defendant of the Federal Truth in Leasing Act – 49 U.S.C. § 14102 and 14704, *et*

*seq*., and 49 C.F.R. Part 376, *et seq* (hereinafter "the Regulations"), with respect to Defendant's original Independent Contractor Operating Agreement (hereinafter "ICOA").  Defendant, after the filing of this litigation, issued a revised Independent Contractor Operating Agreement (hereinafter "RICOA").  In their Amended Complaint, Plaintiffs now also seek declaratory and injunctive relief with respect to the RICOA.

Plaintiffs withdrew and waived their claims for monetary damages shortly before trial,[1] so only Plaintiffs' claims for equitable relief – injunctive relief, accounting, and restitution and/or disgorgement under 49 U.S.C. § 14704(a)(1) – are now before the Court.

On August 29, 2005, the Court certified a class in this action for Plaintiffs' claims as to both versions of the lease used by Defendant with its independent contractors.[2]

Prior to the October 16, 2006 bench trial in this case, the Court held a hearing on September 12, 2006, and made several legal rulings[3] (set forth more completely below) including: the statute in question does provide for a private right of action and invokes the Court's equity jurisdiction; the Court inherited the full range of equitable relief that was originally in the hands of the ICC; the appropriate standard is one of strict, rather than substantial, compliance with the language of the Regulations; the Regulations do not prohibit Defendant from making a profit on so called "marked up optional programs;" and that actual damages are not a predicate for, or element of, *liability* under 49 C.F.R. § 14704(a)(2).  However,

---

[1] *See* Docket No. 251, at 7.

[2] Docket No. 141.

[3] *See* Transcript from September 12, 2006 hearing.

the Court reserved ruling on the necessity of actual damages in the context of a potential

equitable remedy.

<u>Plaintiffs' Claims</u>

      <u>Unlawful charge-backs against compensation</u>.  29 C.F.R. § 376.12(h) requires that

> [t]he lease shall clearly specify all items that may be initially paid
> for by the authorized carrier, but ultimately deducted from the
> lessor's compensation at the time of payment or settlement,
> together with a recitation as to how the amount of each item is to
> be computed.  The lessor shall be afforded copies of those
> documents which are necessary to determine the validity of the
> charge.

      Plaintiffs claim that Defendant's ICOA violated § 376.12(h) by failing to clearly specify

certain charge-backs against compensation (such as fuel, repairs, tires, "termination

administrative fees," transaction fees, "Admin Chg Shop," and "Admin Chg O/O"), and by

failing to contain a recitation as to how the amount of charge-backs for tires, parts, and fuel were

calculated.  Plaintiffs allege that false or misleading representations by Defendant that Plaintiffs

could purchase tires at the "fleet discount price" violated this provision.  Plaintiffs also allege

that Defendant failed to provide Plaintiffs with copies of documents necessary to determine the

validity of the charge-backs.

      Defendant counters that the charge-backs meet the strict compliance standard imposed by

the Court, and that Plaintiffs cannot and did not demonstrate harm or damages.

      <u>Forced purchases</u>.  29 C.F.R. § 376.12(i) requires that "[t]he lease specify that the lessor

is not required to purchase or rent any products, equipment or services from the authorized

carrier as a condition of entering into the lease arrangement."

3

Plaintiffs allege that Defendant required them to purchase "administrative" services, and to rent Qualcomm satellite communications services from Defendant as a condition of entering into the ICOA and RICOA.

With regard to the forced purchase of administrative services, Defendant argues that Plaintiffs elected, and were not compelled, to have Defendant "facilitate" these administrative services.  With respect to the Qualcomm satellite usage fee, Defendant argues that no damages may be awarded because there was no improper benefit to Defendant, and Plaintiffs have failed to show any economic harm.

Improper management of escrow accounts.  29 C.F.R. § 376.12(k) requires, in relevant part, that the lease specify "[t]he amount of any escrow fund . . . and [t]he specific items to which the escrow fund can be applied."   Further, this Regulation requires that:

> The carrier shall provide an accounting . . . . The carrier shall pay interest on the escrow fund . . . . [And at termination,] the carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease . . . .  In no event shall the escrow fund be returned later than 45 days from the date of termination.

Plaintiffs claim that both Defendant's ICOA and RICOA fail to specify the specific items to which the escrow funds can be applied, and fail to specify the deductions from escrow funds that may be made at lease termination.  Plaintiffs argue that Defendants essentially transformed the escrow accounts – the maintenance escrow, the performance bond, and the fuel tax escrow – in "all-purpose" general funds to be used by Defendant for any purpose.  Finally, Plaintiffs claim that Defendant failed to provide final accountings and to return Plaintiffs' escrow funds within 45 days after lease termination.

Defendant maintains that the fuel-tax deductions were not "required" escrow funds under the Regulation but were, rather, voluntarily elected and, thus, are not covered by its mandates. In addition, Defendant asserts that its disclosures in this respect were legally sufficient under, and compliant with, the Regulations, and that Plaintiffs cannot show detrimental reliance or damages because they were aware of the charges.

## I.  FINDINGS OF FACT

To the extent any of the following findings of fact constitute conclusions of law or the application of the law to fact, they are incorporated as conclusions of law.

THE PARTIES

1.  Plaintiffs William Piper, Don Sullivan, Sr., and James Murphy are independent contractors who have leased their equipment and services to Defendant C.R. England ("Defendant").

2.  Plaintiff Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), is a non-profit trade association which represents the interests of independent owner-operators nationwide. The individual and association plaintiffs are referred to collectively as "Plaintiffs."

3.  Defendant is primarily engaged in providing nationwide trucking services to transport freight across the country.

4.  Before 1998, Defendant used employee drivers to provide its freight transportation services. Beginning in 1998, Defendant developed and offered a program to allow a driver the option of being an independent contractor, rather

than an employee.  Since 1998, Defendant's freight transportation services have been performed by both employee drivers and independent contractor employees.

5.      There are two general categories of independent contractor drivers:

    a.      Owner-operators, who are drivers that own or lease their truck before beginning their relationship with Defendant – Plaintiff Murphy is in this category; and

    b.      Lease operators, who lease their truck by executing a Vehicle Lease Agreement ("VLA") with a related entity, Opportunity Leasing, Inc. – Plaintiffs Piper and Sullivan are in this category.

THE LEASE AGREEMENTS

6.      Each owner- or lease-operator (collectively referred to as "independent contractor") entered into an operating agreement with Defendant wherein the independent contractor leased his or her equipment and driving services to Defendant.

7.      There are two relevant versions of the agreement:

    a.      The first version – the original ICOA – was in effect from June 6, 1998, through the summer of 2002.  Thus, this lawsuit covers actions beginning on June 6, 1998.

    b.      The second, revised version – the RICOA – was put into effect beginning in August 2002 and, with minor amendments, is currently in effect.

8.      By August 14, 2002, Defendant had transitioned all of its independent contractors to the RICOA.

THE ICOA

9.      Charge-backs for tires.  Regarding the purchase of tires, the ICOA stated that "YOU may purchase tires at the fleet discount price WE pay plus a 5% administrative fee if YOU authorize on Addendum 3 to have payment to be deducted."[4]

10.     When requested by a Plaintiff, Defendant would provide a Repair Order Detail Report – essentially an invoice showing the parts used or replaced and labor performed on the vehicle.  However, while a 30 percent "mark-up" was included in the price, it was not broken down into categories such that the driver could see and know that he had been charged a mark-up.[5]

11.     While the making of a profit by Defendant is not prohibited by the Regulations, the evidence demonstrated that Defendant failed to disclose the charges incurred by Plaintiffs in this program, and how those charges were to be computed.

12.     Further, with respect to Plaintiff Murphy, Defendant failed to provide documentation of these charges when requested.[6]

---

[4] ICOA, Addendum 2, ¶ IV.

[5] Tr. 10/20; 653: 6-12.

[6] Tr. 10/16; 60:1-9, 13-14.

13.   <u>Charge-backs for parts</u>.  The ICOA stated that Plaintiffs were responsible for "paying all operating expenses, including all expenses for fuel, oil and repairs."[7] Addendum 2 to the ICOA stated that "YOU may have maintenance work done at recommended independent vendors and take advantage of the reduced pricing they offer to business persons under contract with WE."[8]

14.   Defendant operates England Service Center ("ESC") repair facilities in five states, which provide repair and maintenance for independent contractor trucks. Defendant routinely marked up the cost of its services at the ESCs by 30 percent.

15.   The ICOA failed to disclose any information pertaining to charge-backs against Plaintiffs' compensation for repairs and maintenance performed at the ESCs, and failed to disclose the mark-up on parts.

16.   Plaintiffs Murphy and Sullivan testified that when they requested documentation to support these charges, Defendant failed to provide such.[9]

17.   <u>Charge-backs for fuel</u>.  The ICOA stated that "[i]f YOU have secured an advance of any kind from us, such as for fuel, owe us any money or request us to withhold money for any reason on Addendum 3, WE shall make deductions from any monies otherwise due YOU." and, further, "[w]e will attempt to negotiate fuel

---

[7] ICOA at ¶ 7.

[8] ICOA, Addendum 2, at ¶ IV.

[9] Tr. 10/16; 60: 13-14; Tr. 10/18; 339: 15-21.

discounts with fuel vendors and YOU will be advised of the availability of the discounts periodically."[10]

18.     Defendant negotiated fuel price discounts with truck stops, and provided Plaintiffs with "Comdata cards" to purchase fuel.  Defendant charged a 60 percent mark-up on the fuel discount.

19.     While Defendant's making a profit is not prohibited, the ICOA failed to disclose the mark-up and charge-back for fuel, and failed to contain a recitation of how the amounts were to be computed.

20.     Repair-related administrative charges.  The ICOA provided that, if a Plaintiff elected to have maintenance work done at a recommended independent vendor to take advantage of reduced pricing, upon Defendant's approval for a purchase order, Plaintiffs would be charged "a 5% administrative fee per transaction" to be deducted from settlements.[11]

21.     Some time in September 1999, Defendant eliminated the five percent administrative fee described in the ICOA, and implemented a new policy wherein it charged $4.00 each for "admin chg o/o" and "admin chg shop."

---

[10] ICOA at ¶ 4 and Addendum 2, ¶ V.

[11] ICOA, Addendum 2, ¶ IV.

22.     These charges were not disclosed in the ICOA and Defendant did not obtain any
        written agreement from its independent contractor drivers regarding these
        charges.[12]

23.     Further, the ICOA failed to contain a recitation as to how the amounts of the
        repair-related administrative fees were to be computed.

24.     Termination-related administrative fees.  During the ICOA period, Defendant's
        policy was to charge independent contractor drivers who terminated their ICOAs
        prematurely a $500.00 "termination administration fee," as well as a $10.00
        charge for a termination letter.[13]

25.     Neither the "termination administration fee" nor the "termination letter" charge
        were disclosed in the ICOA.  Further, the ICOA failed to disclose how such
        charges were to be computed.

26.     Maintenance escrow.  The ICOA provided for a "maintenance escrow" account,
        but there were no other provisions in the ICOA that specified the specific items to
        which it could be applied, or the conditions Plaintiffs were required to satisfy in
        order to have the escrow funds returned.  As a result, the Court cannot determine
        what specific charges were deducted from Plaintiffs' maintenance escrow
        accounts.

--------

[12] Tr. 10/24; 1025: 5-8.

[13] Tr. 10/18; 626: 20, 526: 4; Tr. 10/25; 1148: 11-14.

27.     Testimony at trial established that Plaintiff Piper received his "final accounting" approximately 55 days after he terminated his ICOA,[14] and Plaintiff Sullivan received his "final accounting" more than seven months after his ICOA termination.[15]

28.     Security deposit/performance bond.  While a "security deposit" is referenced in title in the ICOA, there is no language which is specifically applicable to a "security deposit."  Addendum 3 to the ICOA identifies a charge-back for "Performance Bond $250 down $50 x 5 weeks."  Defendant admitted that the performance bond was an escrow fund.[16]

29.     There are not terms in the ICOA that identify the specific items to which the security deposit or performance bond may be applied.  There are no terms in the ICOA that specify the conditions Plaintiffs were required to satisfy in order to have the security deposit or performance bond returned to them.

30.     Fuel/road tax escrow.  The ICOA provided for the deduction of $0.015 per mile for "fuel/road tax,"[17] and Defendant deducted the same from Plaintiffs'

---

[14] Tr. 10/17; 233:19, 234: 3.

[15] Tr. 10/17; 297: 8-15.

[16] Tr. 10/24; 924: 9-16.

[17] ICOA, Addendum 3.

compensation.  Defendant admitted that it considered these funds to be a fuel/road tax escrow fund.[18]

31.     There are no terms in the ICOA that specify the specific items to which the fuel/road tax escrow funds may be applied.  Nor are there any terms in the ICOA that specify the conditions Plaintiffs were required to satisfy in order to have the fuel/road tax escrow funds returned.

32.     Satellite usage fees.  The Qualcomm system is a satellite communications device which Defendant uses to communicate with its drivers, both employees and independent contractor drivers.

33.     The ICOA provided that Defendant would provide and install the Qualcomm equipment at no cost to the driver, and the driver had to "agree to such installation and to authorize a fifteen dollar ($15.00) per week usage charge to be deducted from contract settlements per Addendum 3."[19]  Addendum 3 identifies a "Satellite Usage Charge" in the amount of $15.00 per week as a charge-back against compensation.

34.     Defendant admitted that, under the ICOA, independent contractor drivers were required to pay the $15.00 Qualcomm fee if they wanted to drive for Defendant.[20]

---

[18] Tr. 10/24; 1000: 14, 1001: 4.

[19] ICOA, Addendum 2, ¶ VI.

[20] Tr. 10/18; 379: 8-17.

12

Plaintiffs Murphy and Piper testified that they were told by Defendant that they were required to install and use the Qualcomm system.[21]

35.   <u>Settlement administrative services</u>.  During the ICOA period, Defendant charged lease operators a "Settlement Admin. Fee," which was intended to cover the costs associated with the drivers "dropping their trip pack in a trip box and being picked up and overnighted to a facility in Ohio where their trips are processed."[22]

36.   Testimony offered at trial showed that lease operators could not avoid the weekly settlement administrative fee.[23]  Further, lease operators had no ability to obtain settlement administrative services from a third party, because the information contained in the settlement statements were derived from Defendant's internal data.

37.   <u>Insurance Administrative Services</u>.  During the ICOA period, every lease operator obtained his or her insurance through Defendant.  Lease operators could not take the truck off the lot without insurance, and were charged a weekly rate for insurance-related administrative services.

38.   Plaintiff Piper testified that he was told that insurance was to be provided by Defendant.[24]  Plaintiff Sullivan testified that he was told that Defendant's

---

[21] Tr. 10/16; 73:19-25; Tr. 10/17; 218:25, 219: 4.

[22] Tr. 10/24; 963: 6-10.

[23] Tr. 10/24; 961: 22, 962: 2.

[24] Tr. 10/17; 254: 9-16.

insurance was a "package deal" with the truck.[25]  Likewise, Plaintiff Murphy

testified that he was required to initial the line next to the insurance administrative

fee if he wanted to enter into the ICOA, and that he could not have refused to

obtain insurance from Defendant and still have been able to enter into the ICOA

with Defendant.[26]

THE RICOA

39.  Charge-backs against compensation.  The RICOA provides that Defendant shall

notify drivers of any changes by "Qualcomm, transmission, fax, or other written

notice," and that the driver "shall not be subject to any such change until ten (10)

calendar days after such notice or such later time as is set forth in the notice."[27]  It

further provides that "[i]f there are any changes [to this Agreement], they must be

in writing and signed by both parties, except as otherwise provided with respect to

charge-backs and deductions in Section II for Attachment 3 and Section VI of

Attachment 4."[28]

40.  Forced purchases.  While the RICOA requires drivers to maintain certain types of

insurance, it makes it optional whether they obtain insurance on their own or

through Defendant.  Plaintiffs presented no contrary evidence.  Under the RICOA,

---

[25] Tr. 10/17; 327: 10-11.

[26] Tr. 10/17; 192: 25, 193: 3.

[27] RICOA, Attachment 3, Section II.

[28] Ex. V-7, Attachment 3-6, ¶ 17.

14

an independent contractor driver does not pay the insurance administration fee

unless he or she elects to obtain one or more types of insurance through

Defendant.[29]

41.    In the RICOA, Defendant specifically discloses that it charges each independent

contractor driver a settlement administration fee of $3.46 per week.[30]  Further, the

RICOA specifies that the fee is charged "to cover OUR performance of

administrative services in connection with numerous non-insurance related

aspects of the" RICOA.[31]

42.    Escrow funds.  The provisions of the RICOA which address the escrow funds and

specific items to which escrow funds may be applied are found in Section III of

Attachment 2, at pages 2-3 through 2-6.  Section III contains a section titled,

"Specific Items to Which Escrow Funds May Be Applied," and lists specific

items, including reference to 37 specific types of charge-backs and deductions

authorized by the independent contractor driver.[32]

## II.  CONCLUSIONS OF LAW

To the extent any of the following conclusions of law constitute findings of fact, they are

incorporated as findings of fact.

---

[29] Ex. V-7, Attachment 3, ¶ VI.

[30] Ex. V-7, Attachment 3-5.

[31] *Id.*

[32] Ex. V-7, Attachment II, ¶ III(b)(1), at 2-5.

<u>AUTHORITY</u>

43.     The Court has jurisdiction pursuant to 18 U.S.C. §§ 1331 and 1337, and 28 U.S.C.
§ 2201.

44.     Venue in this District is proper.

<u>PREVIOUS RULINGS</u>

45.     At the September 12, 2006 hearing, the Court made the following legal rulings:

   a.     The statute under which this action is brought – 49 U.S.C. § 14704 –
provides for a private right of action to owner-operators to enforce leasing
regulations and, by so doing, the ICC Termination Act invoked the Court's
equity jurisdiction.[33]

   b.     In reviewing the total regulatory scheme and the history of the evolution of
the ICC regulation to private claims by injured parties, the Court found
that it inherits the ability to seek the full range of equitable relief that was
originally in the hands of the ICC.  Consistent with its equitable powers,
the Court has the discretion to determine the proper and equitable nature of
the relief, if any, it may award in this case.[34]

---

[33] Transcript from September 12, 2006 hearing, at 9 (citing *United States v. RX Depot*,
438 F.3d 1052 (10th Cir. 2006)) (hereinafter "Tr.").

[34] *Id.* at 9.

c.     In determining whether a violation of the Regulations has occurred, the appropriate standard is one of strict, rather than substantial, compliance with the language of the Regulation.[35]

d.     As a matter of law, the Regulations do not prohibit Defendant from making a profit on so-called "marked up optional programs."[36]

e.     Actual damages are not a predicate for, or element of, *liability* under 49 C.F.R. § 14704(a)(2).[37]  However, that ruling was limited to a finding of liability only; the Court did *not* rule on the necessity of actual damages in the context of a potential equitable remedy.

DECLARATORY JUDGMENT

46.     28 U.S.C. § 2201 provides, in relevant part, that a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."[38]

---

[35] *Id.*, at 5-6.

[36] *Id.* at 6.

[37] *Id.* at 7-8 (citing *OOIDA v. Allied Van Lines*, 231 F.R.D. 280, 284 n.10 (N.D.Ill. 2005)).

[38] 28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57.

A.    <u>Declaratory judgment is warranted for Defendant's violations of the ICOA</u>

47.    With respect to the ICOA, the Court finds, by a preponderance of the evidence, and declares judgment that Defendant has violated the Regulations in the following respects:

    a.    Failure to clearly specify certain charge-backs against compensation, in violation of 29 C.F.R. § 376.12(h);

    b.    Forced purchases, in violation of 29 C.F.R. § 376.12(i); and

    c.    Improper management of escrow accounts, 29 C.F.R. § 376.12(k).

48.    <u>Disclosure of charge-backs</u>.  The Court finds that Defendant has violated 29 C.F.R. § 376.12(h) by failing to clearly specify in the ICOA certain charge-backs against compensation, including charges for fuel, repairs, tires, "termination administration fees," transaction fees, "Admin Chg Shop" and "Admin Chg O/O." Defendant failed to include a recitation as to how the amount of charge-backs for tire, parts, and fuel were calculated.  Further, Defendant failed to provide Plaintiffs with copies of documents necessary to determine the validity of the charge-backs.

49.    This is a disclosure violation.  As the Court has already ruled, charge-backs that include profits and fees are not *per se* unlawful under § 376.12(h); the Regulations do not preclude Defendant from making of a profit.[39]  Defendant's violation of the Regulations by previously failing to disclose mark-ups is *not* a result of Defendant

---

[39] *See Id.*, at 6.

having made any profit off of those mark-ups.  Simply proving that Defendant

charged more to Plaintiffs for a product or service than it paid to a third-party

vendor is insufficient, without more, to establish that Plaintiffs have sustained

damages as a result of a disclosure violation under § 376.12(h).[40]

50.    <u>Forced purchases</u>.  The Court finds that Defendant has violated 29 C.F.R. §

376.12(i) by failing to specify in the ICOA that Plaintiffs were not required to

purchase or rent any products, equipment or services from Defendant as a

condition of entering into the lease.  Specifically, even if it were true, as

Defendant argues, that its administrative services were voluntary and that the

Qualcomm system did not bestow upon it improper benefit, the Court finds that

the ICOA failed to adequately specify that Plaintiffs' purchase of these services

were not a predicate to the agreement.

51.    <u>Improper management of escrow accounts</u>.  The Court finds that Defendant has

violated 29 C.F.R. § 376.12(k) by failing to clearly set forth in the ICOA the

specific items to which escrow funds could be applied, resulting in undisclosed

and, therefore, improper application of those funds to outstanding obligations.

The Regulations allow Defendant to deduct monies for obligations incurred

"which have been previously specified in the lease."  The Court finds that the

---

[40] *See Owner-Operator Indep. Drivers Assoc. v. Landstar Inway, Inc.*, 2007 WL 958284,
*4 (M.D.Fla March 20, 2007)

Regulations clearly prohibit the deduction of monies for obligations which have *not* been specified in the lease.

52.     Further, Defendant violated this provision by failing to provide an accounting to Plaintiffs, and by failing to return escrow fund balances within 45 days of the date of termination.

B.      No Violations in RICOA

53.     The Court finds, by a preponderance of the evidence, that the RICOA does not violate the Regulations.  Therefore, Plaintiffs are not entitled to declaratory relief in this respect.

EQUITABLE REMEDIES – ICOA AND RICOA

54.     Having made the finding that the RICOA did not violate the Regulations, no equitable relief may issue with respect to it.

55.     With respect to the ICOA, having made the finding that Defendant violated the strict requirements of the above-referenced Regulations, the relevant and vital inquiry is what remedy or remedies the Court can and should order in this matter.

56.     As noted above, in its September 12, 2006 ruling, the Court ruled that it has inherited "the ability to seek the full range of equitable relief that was originally in the hands of the ICC."[41]  At that time, the Court did not make a determination of what those equitable powers were but, rather, found that it retained "the discretion

---

[41] Tr. at 9.

to determine the proper and equitable nature of the relief, if any, it may award in this case."[42]  To that end, the Court offers the following.

57.     A careful review of the cases cited by the parties – in particular, those cited by Plaintiffs – reveals that the ICC had the power to order:

   a.      Injunctive relief (*ICC v. Brannon Sys., Inc.*,[43] *ICC v. Interstate Contract Carrier*,[44] *ICC v. Lifschultz*,[45] and *ICC v. Bug-Eye Transp.*[46]);

---

[42] *Id.*

[43] 686 F.2d 295, 296 (5th Cir. 1982) (finding that "the I.C.C. has inherent power to seek injunctive relief to enforce the regulatory process.").

[44] 598 F.Supp. 661 (D.Utah 1984) (finding that defendant violated the escrow provisions of the leasing regulations, and ordering an accounting and restitution, as well as injunctive relief).

[45] 151 B.R. 150, 153-54 (N.D.Ill. 1993) (enjoining defendant, and ordering it "to perform an audit and to provide an accounting" and to "make restitution").

[46] 1987 WL 7259 (N.D.Ill. Feb. 23, 1987) (enjoining defendant, and ordering an accounting and restitution for defendant's violations of the escrow provisions of the leasing regulations).

b.      Restitution for *actual damages* (*ICC v. B&T Transp. Co.*,[47] *ICC v. J.B.*

*Montgomery, Inc.*,[48] *Bug-Eye Transp.*,[49] *Interstate Contract Carrier*,[50]

*Lifschultz*,[51]); and

c.      An accounting (*Interstate Contract Carrier*,[52] *Lifschultz*,[53] *Bug-Eye*

*Transp.*,[54] *Interstate Contract Carrier*[55]).

58.      There is nothing in these cases that would suggest that the ICC had the equitable

power to order disgorgement or restitution in the absence of *actual damages*.

Again, the Court notes that its previous ruling regarding actual damages went only

to the issue of whether actual damages were a prerequisite to a finding of *liability*.

The Court now assesses the necessity of actual damages in the context of

equitable remedies.

---

[47] 613 F.2d 1182 (1st Cir. 1980) (remanding to district court with instructions to entertain ICC's request for restitution).

[48] 483 F.Supp. 279, 280 (D.Colo. 1980) (holding that ICC may pursue "restitutionary relief" on behalf of shippers for defendant's duplicative billing and overcharges).

[49] *See supra* note 46.

[50] *See supra* note 44.

[51] *See supra* note 45.

[52] *See supra* note 44.

[53] *See supra* note 45.

[54] *See supra* note 46.

[55] *See supra* note 44.

59.  *B&T Transp.*[56] is the single case that may arguably be read as vesting authority in the ICC to order restitution in the absence of actual damages.  There, the ICC ordered restitution of rates not covered by tariffs.  This case is distinguishable, however, because of the rule that was in place at that time – that any rate paid which was not covered by a tariff on file with the ICC was deemed illegal, and constituted an over-charge, *i.e.*, an actual damage.  Both factually and legally, *B&T Transp*. is distinguishable from the case at bar, and the Court does not find Plaintiff's reading persuasive or applicable here.

60.  Therefore, the Court rejects the theory that it inherited any authority to order disgorgement or restitution in the absence of actual damages.

61.  Plaintiffs rely on the cases of *Porter v. Warner Holding Co.*[57] and *RX Depot*[58] for the proposition that this Court can exercise all inherent equitable powers, unless otherwise provided by statute.  However, an analysis of the statute in question in this case – 49 U.S.C. § 14704 – reveals that this Court has the express authority to order:

a.  Injunctive relief – § 14704(a)(1);[59]

---

[56] 613 F.2d 1182.

[57] 328 U.S. 395 (1946).

[58] 438 F.3d 1052.

[59] Section 14704(a)(1) provides that a "person may bring a civil action for injunctive relief."

23

     b.     Damages sustained – § 14704(a)(2);[60] and

     c.     Attorney fees – § 14704(e).

62.     The Court finds that this statute limits it to those three measures of relief.  *See Hartman v. Kickapoo Tribe Gaming Comm'n*,[61] and *Landstar*,[62] and the reasoning relied upon and cases cited therein.

63.     <u>Damages</u>.  In the instant case, as noted above, Plaintiffs no longer seek monetary damages and the Court finds that none were established.

64.     <u>Accounting</u>.  However, the Court finds that Defendant's violation of the escrow provision of the Regulations warrants a class-wide accounting.  Defendant will be required to make an accounting for the escrow funds as set forth below.

65.     <u>Injunction</u>.  With respect to injunctive relief, Plaintiffs initially argued that they were not required to demonstrate irreparable harm,[63] citing *Star Fuel Marts, LLC v. Sam's East, Inc.*,[64] for the proposition that "[w]hen the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by statute which provides for injunctive relief to prevent such

---

[60] Section 14704(a)(2) provides that a carrier or broker "is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation" of the Regulations.

[61] 319 F.3d 1230, 1232-33 (10th Cir. 2003) (quoting *Nat'l R.R. Passenger Corp. v. Nat'l R.R. Passengers*, 414 U.S. 453, 458 (1974)).

[62] 2007 WL 958284.

[63] Docket No. 263, at 21; Docket No. 284, at 14.

[64] 362 F.3d 639, 651 (10th Cir. 2004).

violations, irreparable harm to the plaintiffs need not be shown."[65]  However, it

appears that Plaintiffs have abandoned this position,[66] now apparently conceding

the irreparable harm standard, which has been recently reiterated by the Supreme

Court in *eBay Inc. v. MercExchange, L.L.C.*[67]

66.     In *eBay*, the Supreme Court reiterated that a plaintiff seeking a permanent

injunction must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies
> available at law, such as monetary damages, are inadequate to
> compensate for that injury; (3) that, considering the balance of
> hardships between plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not be disserved
> by a permanent injunction.[68]

67.     This Court need not enter an injunction against Defendant merely because it has

found that Defendant's ICOA violated the Regulations.[69]  It is clear that

"injunction is an equitable remedy that does not issue as of course."[70]

---

[65] *Id.* at 651 ("it is not the role of the courts to balance the equities between the parties where Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in any activity which the statute prohibits.") (internal citations omitted).

[66] Docket No. 287, at 4.

[67] 26 S.Ct. 1837 (2006).

[68] *Id.* at 1839.

[69] *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."); *see also Landstar*, 2007 WL 958284, at *9.

[70] *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987).

RICOA

68.   The Court has found that the RICOA does not violate the Regulations, and no injunction will issue with respect to it.

ICOA

69.   It is not disputed that Defendant implemented the RICOA in July 2002, and has used the RICOA continuously since that time.  The Court finds that there is no reasonable possibility that England will revert to using the ICOA after the conclusion of this case.   Therefore, the Court finds that there is no threat of future violations with respect to the ICOA.

70.   The Court has discretion where, as here, a defendant has abandoned the challenged practices.[71]  When a challenged practice has been discontinued, a claim for injunctive relief will be "moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated,"[72] including where the governing document has been "amended to cure the alleged . . . problem."[73]

71.   With respect to the disclosure violations found above, the Court concludes that the ICOA was superseded in 2002 by the RICOA, which remedied the disclosure violations.  Defendant has expressed an apparently sincere intent to comply with the Regulations, and the Court is not satisfied that injunctive relief is appropriate.

---

[71] *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.10 (1982).

[72] *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (internal citations omitted).

[73] *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004).

72.     Based upon the above, the Court declines to enter an injunction in this case, because Plaintiffs have not met their burden of showing irreparable harm.

### III.  CONCLUSION

Therefore, based upon the above, it is hereby

ORDERED that Declaratory Judgment is entered in favor of Plaintiffs and against Defendant as it relates to violations in the ICOA of the Regulations' disclosure requirements, set forth in 29 C.F.R. §§ 376.12(h), (i), and (k).  No judgment is entered as to Plaintiffs' claims arising out of the RICOA.  It is further

ORDERED that Defendant shall engage in a class-wide accounting of escrow funds for its violation of 29 C.F.R. § 376.12(k).  It is further

ORDERED that Defendant shall file with the Court, within thirty (30) days, a written proposal regarding the class-wide accounting.  Plaintiffs shall have fifteen (15) days to respond, if they so choose.  The Court strongly encourages the parties to stipulate and cooperate as to the procedure they will follow with regard to the class-wide accounting.  However, the Court will resolve any disputes on this matter in writing after the filings of the parties have been submitted. It is further

ORDERED that Plaintiffs' remaining claims for equitable remedies, including an injunction, are DENIED.

SO ORDERED.

DATED  June 20, 2007.

                              BY THE COURT:

                              _____
                              TED STEWART
                              United States District Judge